In the Matter of the Arbitration between JOSEPH ERMOLIEFF, Petitioner, against SELMAN LISS, Respondent.

Supreme Court, New York County, May 25, 1931.

*Murray Levine*, for the petitioner.

*Louis H. Solomon*, for the respondent.

COTILLO, J.   This is a summary trial of the issue of frauα raised by the answering affidavit of Selman Liss in a proceeding to compel him to arbitrate certain differences pursuant to the provisions of a contract entered into by the parties.

The moving affidavit alleges the making of a written contract containing an arbitration clause, a dispute, a demand on the part of Ermolieff for arbitration and a refusal by Liss.   The answering affidavit denies none of the above allegations but sets forth that the contract was induced by fraud and misrepresentation on the part of Ermolieff and that Liss repudiated the contract immediately upon the discovery of the fraud.

The contract was entered into in Berlin, Germany, on June 16, 1926.   Ermolieff was a Russian exiled in Berlin.   Liss was an American citizen who, having retired from business, was traveling with his family in Germany.   He was introduced by his son-in-law to another Russian, one Boberman, who in turn introduced him to Ermolieff.   Boberman was attempting to raise money for Ermolieff in connection with Ermolieff's establishing of a film business in Rumania.

Ermolieff, after the introduction to Liss, gave him a copy of a document on a yellow paper typewritten in the Russian language, containing eight points of an alleged concession from the Rumanian government.   The value of the concession lies in four of the eight points: The first, " The right of contingent," by which is meant the right to regulate the import of films manufactured abroad; the second, " Tax Exemption," for the movie theatres showing the films made in Rumania, for a term of three years from the date that the first Rumanian film was to be shown, and a tax of one-third of the tax usually paid for showing films made abroad; the fourth, the privilege of requiring all movie theatres in Rumania to exhibit films made by the concessionaire in a proportion to be fixed by the Minister; the seventh, the privilege of allowing the pictures to be taken in the entire Rumanian territory and to call

upon the assistance of the personnel of the army and navy whenever necessary. When asked by Liss how the Rumanian market would be compelled to buy films from the concessionaire as set forth in point 4, Ermolieff replied, " By imposing the requirement as a condition of issuing licenses to all theatres in Rumania exhibiting films." Ermolieff, according to Liss' testimony, stated that all of the privileges mentioned in the four points above were granted to him by the Rumanian government and were merely awaiting the acceptance of Ermolieff; that he required capital to accept the concession and put the grant in legal form, and invited Liss to join in the enterprise.

The contract was drawn by a Russian lawyer living, like Ermolieff and Boberman, in exile in Berlin, who although he had no license to practice law in Germany accepted a retainer in this matter as a lawyer, was paid for his services, and later became the collector on this claim in behalf of Ermolieff. Liss asserts that there was a reliance by him upon the representations above mentioned made by Ermolieff; that he entered into the contract and proceeded to Bucharest with Ermolieff and Boberman to procure the official sanction of the Rumanian government. After waiting in the office of Ermolieff all afternoon on the day of their arrival in Bucharest, Ermolieff finally came in after an alleged conference with the Rumanian officials and told Liss that he had obtained the grant, and detailed to him the completeness of the monopoly and the value of the concession, producing a photostat purporting to be a copy of the government grant. This was in Rumanian, of which language Liss did not read or understand a word. Ermolieff in his testimony taken by deposition denies the misrepresentations and asserts he gave Liss the translation of the concession two days before the drawing of the supplemental contract, and that Liss consulted his lawyer about it. The supplemental contract of August sixth is in the handwriting of Ermolieff and is not drawn by a lawyer.

The sole matter to be determined by the court is whether or not the contract was entered into by Liss, relying upon representations made by Ermolieff, and whether those representations were false and known to be false by Ermolieff at the time of the making. (*Matter of Cheney Bros.* v. *Joroco, etc.*, 218 App. Div. 652.) It strikes the court that there can be no question but that at the time of the making of the representations specified in paragraphs 1, 2, 3 and 7 of the alleged concession Ermolieff did misrepresent what the concessions were, and that Liss was ignorant of the facts represented by Ermolieff; and there is no question in the court's mind but that these representations were false and were relied upon by Liss.

Section 2 of the Arbitration Law (as amd. by Laws of 1921, chap. 14) reads as follows: "A provision in a written contract to settle by arbitration a controversy thereafter arising between the parties to the contract, or a submission hereafter entered into of an existing controversy to arbitration pursuant to title eight of chapter seventeen of the code of civil procedure, or article eighty-three of the civil practice act, shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the ratification of any contract."

This section of the Arbitration Law has been passed upon by the Court of Appeals in the case of *Matter of Zimmerman* v. *Cohen* (236 N. Y. 15). Judge CRANE, in writing the opinion of the court (at p. 20), clearly defined the section and in particular the word "irrevocable." The holding was: "The word 'irrevocable,' here used, means that the contract to arbitrate cannot be revoked at the will of one party to it, but can only be set aside for facts existing at or before the time of its making, which would move a court of law or equity to revoke any other contract or provision of a contract." (See, also, *Matter of Cheney Bros.* v. *Joroco, etc., supra,* where it was stated: "The question as to whether or not the contract was fraudulently induced raises an issue of fact which must be tried before the right to arbitration under the contract may be enforced.") The word "irrevocable," therefore, must be narrowed in its application to prohibit the cancellation of the arbitration clause of an otherwise valid contract. But if the entire contract in which the arbitration clause is contained is rescinded, that clause falls with it.

Equity will grant relief when necessary to prevent the consummation of a fraud. (*Freeman* v. *Freeman,* 43 N. Y. 34.) In other words, before the court can hold that the contract which contains the arbitration clause can be rescinded, it must find that there has been a representation of alleged existing fact, that the representation must be false in fact, and that it must be made with the intent to deceive and the person to whom it is made must believe it. (*Scarsdale Publishing Co.* v. *Carter,* 63 Misc. 271.) Arbitration cannot be forced upon parties where the very contract sought to be enforced is founded or based on fraud, and in determining whether or not fraud has been used to induce the party to enter into a contract which contains an arbitration clause, the same principles of law are involved as in the determination of any other contract. (*Matter of American Eagle Fire Insurance Co.* v. *New Jersey Insurance Co.,* 240 N. Y. 398.)

Where there has been fraud in the very inception of the making of the contract, it would shock the sense of equity to compel the enforcement thereof, and I hold that after a careful consideration

of the testimony and the exhibits offered during the course of this trial, Liss has established by a fair preponderance of the evidence misrepresentations by Ermolieff of existing material facts relied upon by Liss in entering into the contract, all to his damage, and these warranted him to repudiate the contract. Submit findings in accordance with these conclusions.